IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge S. Kato Crews

Civil Action No. 1:24-cv1954-SKC-KAS

BRINKERHOFF RESTAURANTS LLC,

    Plaintiff and Counter Defendant,

v.

CASTLE PINES GOLF CLUB, INC.,

    Defendant and Counter Claimant.

---

**ORDER DENYING COUNTER CLAIMANT'S
MOTION FOR PRELIMINARY INJUNCTION (DKT. 23)**

---

Plaintiff Brinkerhoff Restaurants LLC ("Brinkerhoff") filed this case seeking a declaration that its depiction and use of a hummingbird in marks associated with its planned new bar offering in Castle Rock, Colorado, does not infringe the hummingbird marks belonging to Defendant Castle Pines Golf Club, Inc. ("Castle Pines" or "the Club"). Dkt. 1. Castle Pines, in turn, filed cross claims under the Lanham Act, the Colorado Consumer Protection Act, and Colorado common law, seeking damages and a permanent injunction prohibiting Brinkerhoff from opening its new bar and restaurant concept under its hummingbird mark and the name "Bar Hummingbird at the Brinkerhoff." Dkt. 15.

1

Castle Pines also filed the present Motion for Preliminary Injunction, for which the Court held an evidentiary hearing on October 11, 2024. Dkt. 23, 38. The Court has reviewed the Motion and related briefing, the entire record, and has considered the evidence presented at the preliminary injunction hearing. Because the Court finds the marks at issue are not likely to cause consumer confusion, the Motion is DENIED.

### A. FINDINGS OF FACT

The Court makes the following findings of fact ("FOF") based on the parties' filings, attachments, and the testimony and exhibits presented at the hearing on October 11, 2024. These findings are for purposes of this Order only:

#### The Brinkerhoffs

1. The Brinkerhoff family's restaurants are well established in Colorado and include the Mexican restaurant La Loma in Denver and a second La Loma location in Castle Rock.[1] The Brinkerhoff family also owns Sierra Restaurant in Lone Tree and Caldéro in downtown Denver. (Tr. at 164:14-165:15; Dkt. 25-1.)

2. The Brinkerhoff restaurants are inspired by Mexican cuisine, architecture, and design, including their names and branding. (*See* Tr. at 165:66-12.)

---

[1] Two additional La Loma locations are under construction in the Town of Parker and Greenwood Village.

2

3. The Brinkerhoff restaurants have won many awards over several decades and are widely known in the Colorado restaurant industry. (Tr. at 165:20-170:7.)

4. The Brinkerhoff family's restaurants, including La Loma, Sierra, and Caldero, do not utilize marketing tactics and rarely post updates on their social media pages, instead relying on earned goodwill and word of mouth. (Dkt. 25-1 at ¶¶16-18.)

5. Mark Brinkerhoff is the CEO of Brinkerhoff Restaurants LLC and has been working in the restaurant industry for the past 28 years, including assisting his father with the original La Loma restaurant, which has been a Mexican restaurant staple in the Denver community since 1973. (Tr. at 148, 164:14-22.)

6. Mr. Brinkerhoff and his wife, Johana "Jo" Brinkerhoff, co-founded Bar Hummingbird at the Brinkerhoff, a bar and restaurant concept located adjacent to the forthcoming restaurant, The Brinkerhoff. Both establishments, which are currently under construction, are owned by Plaintiff Brinkerhoff and will share a parking lot with the La Loma restaurant in Castle Rock. (*See* Tr. at 148, 167:13-168:1.)

7. The Brinkerhoff and Bar Hummingbird at the Brinkerhoff are the first restaurant projects Mr. Brinkerhoff has undertaken independently from his family. (Tr. at 196:17-19.)

8. The Brinkerhoff and Bar Hummingbird at the Brinkerhoff will be open to the public and will serve as a new amenity for the entire Castle Rock community.

(Tr. at 205:15-22.) They will be open to the public at least 360 days of the year from 11:00am-11:00pm. (Tr. at 176:6-8).

9. The intended trademark for Bar Hummingbird at the Brinkerhoff depicts a naturalistic rendering of a single watercolor hummingbird in a front-facing position with its head pointed upward. The hummingbird hovers above a combination of black cursive and blue block lettering ("Brinkerhoff Mark"):



10. Although Mr. Brinkerhoff applied for a registered trademark in class 43 for bar and restaurant services, the United States Patent and Trademark Office ("USPTO") denied the request based on a different hummingbird mark unrelated to this case.

11. Mrs. Brinkerhoff testified that Bar Hummingbird at the Brinkerhoff is an homage to her Mexican heritage and the migration of hummingbirds in Castle Rock. (Tr. at 142:1-149:20.) Hummingbirds hold spiritual significance in Mexican culture. (Tr. at 143:22-2525.)

4

12. In addition, Mr. and Mrs. Brinkerhoff traveled to Paris during their honeymoon where they visited Bar Hemingway at the Ritz Paris, which also inspired the name of Bar Hummingbird at the Brinkerhoff. (Tr. at 147:11-148:17.)

### Castle Pines Golf Club

13. Castle Pines is an exclusive golf club in Castle Rock, Colorado. (Dkt. 23 p.2.) The Club is regularly recognized as among the best golf courses in the country. *Id.* at p.3.

14. It is an invitation-only club requiring both significant initiation fees, monthly dues, and a yearly capital assessment. Members are allowed to have guests on limited occasions throughout the year. (Dkt. 25-1 at ¶¶43, 46.) The Club is open to its members from May to October and is closed for six months of the year. (Tr. at 84:4-11.) It currently has 400 members. (Tr. at 18:4.)

15. Castle Pines also offers food and beverage options for members and their invited guests. (*See* generally Tr. at 59-89.) But it does not own or operate a public restaurant or bar that is open to the public or the Castle Rock community.

16. The Club is located behind a private gate with a keypad, four miles off I-25, down a forested road, and it is surrounded by high-end homes within a gated residential community called The Village at Castle Pines ("The Village"). (Tr. at 185:19-25, Tr. at 186, Tr. 187: 1-20.) The Castle Pines Homes Association is the master property owners' association for The Village. (Dkt. 25-10.)

17. There are cottages located within The Village on Hummingbird Drive, called the "Hummingbird Cottages". (Dkt. 25-8.) The Club owns four of the cottages and the rest are owned by others. (Dkt. 25-9.). The street, Hummingbird Drive, was named by Douglas County and it is not owned by the Club. (Dkt. 25-11.)

18. The Castle Pines logo, and one of the trademarks at issue in this case, depicts two birds oriented in a side view and pointed to the right (the "Club Mark"). This registered mark includes a thin swirl that traces a circular path around the outside of the birds and appears in black or color renderings:

 

19. The registered Club Mark includes no words. (Dkt. 23-3.) When the Club Mark is used with words it is with "Castle Pines Golf Club." (Tr. At 44:1-6, 45:11-20.)

20. The Club Mark is registered for "golf club services," "country club services," and a wide variety of goods including various articles of clothing and hats, drinking glasses, and golf accessories, among other items. (Hearing Ex. A-14 pp. 5, 8, and 11.)

21. Castle Pines uses the Club Mark with its bar, restaurant, catering, and private event services. (Tr. at 62:18-66:3, 66:20-67:9, 68:3-70:20, 72:8-18; 74:18- 75:9.)

6

It also uses the Club Mark with "The Hummingbird Party"—its annual member-guest golf tournament, which it has hosted over the past several decades (the "Party Mark").[2] (Tr. at 22:14-23:5.)

22.     The Party Mark includes a color rendering of the Castle Pines logo above the word "Hummingbird" written in red script. The word "Party" appears below and to the right in dark-block all caps lettering, and the word "The" appears above and to the left in the same dark-block all caps lettering:



23.     The Hummingbird Party is not a commercial or public event. It is a golf tournament put on by Castle Pines for its female members and their guests, with fewer than 100 participants. (Tr. at 53:9-13.) Castle Pines has never hosted an event outside of the Club called "The Hummingbird Party." (Tr. at 53:14-17.)

### The Brinkerhoffs' History with Castle Pines

24.     Mr. Brinkerhoff's great uncle was among the 12 founding members of Castle Pines (Dkt. 23-1 ¶35; Hearing Ex. A-15 p. 3). And his grandfather was an early charter member of Castle Pines. (Dkt. 23-1 ¶21-22; Tr. at 27:2-9.)

---

[2] The Party Mark is not registered with the USPTO.

25. As a teenager, Mr. Brinkerhoff worked in the men's locker room at Castle Pines. (Tr. at 193:6-13.) Although they are not members of Castle Pines, Mr. and Mrs. Brinkerhoff live in the Village in a Hummingbird Cottage with an address on Hummingbird Drive. (Hearing Exs. A-20, A-22; Tr. at 32:21-24, 55:7-15; Tr 172:7-8, 172:21-22; 159:15-17.)

26. Mr. Brinkerhoff has been a guest at Castle Pines, where he played golf and dined at the club bar and restaurant. (Dkt. 23-1 ¶ 36; Tr. at 30:6-10; 116:5-9; 78:18-21.) Mrs. Brinkerhoff has also played golf there as a guest. (Tr. at 151:16-18, 152:12-15.) In addition, she previously worked with Castle Pines' dining and catering manager to plan an event held at and catered by the Club. (Tr. at 80:4-21; 152:1-4.)

## B. PRELIMINARY INJUNCTION

Injunctive relief is an extraordinary remedy which should only be granted when the moving party clearly and unequivocally demonstrates its necessity. *See Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). Granting such "drastic relief" is the exception rather than the rule. *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888-89 (10th Cir.1989); *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).

In the Tenth Circuit, a party requesting injunctive relief must clearly establish the following: (1) the party will suffer irreparable injury unless the injunction issues; (2) the threatened injury outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the

8

public interest; and, (4) there is a substantial likelihood of success on the merits. *Id.* "The purpose of a preliminary injunction is not to remedy past harm but to protect plaintiffs from irreparable injury that will surely result without their issuance." *Schrier*, 427 F.3d at 1267.[3]

### C. ANALYSIS

**1.    Substantial Likelihood of Success on the Merits**

Castle Pines seeks a preliminary injunction on its claims under the Lanham Act for trademark infringement and unfair competition. To establish these claims, a plaintiff must prove: (1) the mark is protectable;[4] (2) the defendant used the mark in connection with commercial use; and (3) the defendant's use of the mark is likely to cause confusion or mistake. *See Utah Lighthouse Ministry v. Found. for Apologetic Info. and Research*, 527 F.3d 1045, 1050 (10th Cir. 2008); *Donchez v. Coors Brewing Co.*, 392 F. 3d 1211, 1219 (10th Cir. 2004); *Clearly Building Corp. v. David A. Dame, Inc.*, 674 F. Supp. 2d 1257, 1270 (D. Colo. 2009).

---

[3] The parties dispute whether the "heightened standard" applies to Castle Pines request for relief. The Court does not address this question because even under the traditional standard, the Court finds injunctive relief is not warranted.

[4] While there is no question the registered Club Mark is protectable, the parties dispute whether the unregistered Party Mark is a protectable trademark. The Court does not address this, however, because even assuming the Party Mark is protected, the Court concludes Castle Pines has not established a likelihood of success on the merits of its infringement and unfair competition claims.

9

The central inquiry on trademark infringement and unfair competition claims is the likelihood of consumer confusion. 15 U.S.C. §§ 1114(1), 1125(a); *see Beltronics USA, Inc. v. Midwest Inv. Distrib., LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009); *Winmark Corp. v. Schneeberger*, No. 13-cv-0274-WJM-BNB, 2013 WL 1154506, at *5 (D. Colo. Mar. 19, 2013). In determining whether a likelihood of consumer confusion exists, the Court considers: "(1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks." *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002). This is not an exhaustive list and no one factor is dispositive. *Id.*

### a. Degree of Similarity

When assessing the similarity of the competing marks, courts consider sight, sound, and meaning as they are encountered by consumers in the marketplace. *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999). The Court must determine whether the Brinkerhoff Mark will confuse the public when presented singly, rather than when presented side by side with the Club and Party Marks. *Id.* When doing so, the Court weighs the similarities more heavily than the differences. *Sally Beauty Co.*, 304 F.3d at 972. In this case, the nominal similarity of the marks, if any, weighs in favor of Brinkerhoff.

Visually, the Court finds the Brinkerhoff Mark is strikingly dissimilar from the Club Mark, "thus precluding confusion even when the marks are singly presented." *Universal Money Centers, Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1531 (10th Cir. 1994). As depicted above, the Brinkerhoff Mark is a single graphic hummingbird and text in cursive lettering stacked above smaller block lettering, whereas the Club Mark is two graphic hummingbirds with no words and a thin swirl around them. (FOF at ¶¶9, 18.) Moreover, the bird renderings in each mark are also dissimilar. The Brinkerhoff hummingbird is a naturalistic, brightly and multi-colored, watercolor image of a single front-facing hummingbird, while the Club Mark is two abstract, geometric-shaped hummingbirds in profile surrounded by a thin swirl. *Id.* Even when rendered in color, the Castle Pines hummingbirds are depicted in bright red and green (with shades of gray, and black beaks), suggesting an altogether different species of hummingbird from the Brinkerhoff bird.[5] As a result, even assuming there are any similarities in the marks, the Court finds those similarities of nominal significance.

Next, accepting Castle Pines' argument that its visual representation of hummingbirds in its mark is equivalent to the word "hummingbird," the Court nevertheless concludes the competing marks have different sounds and cadences.

---

[5] The Americas are home to 366 hummingbird species. *Hummingbirds of North America*, U.S. Fish & Wildlife Service, https://www.fws.gov/story/hummingbirds-north-america (last visited December 16, 2024).

11

Although Castle Pines urges the Court to disregard the words "bar" and "at the Brinkerhoff," the Court must consider all elements of the mark. *See Universal Money Centers, Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1531 (10th Cir. 1994) (citing *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1570–71 (Fed.Cir.1983)) ("While it is true that the dominant portion of each mark is entitled to greater weight in evaluating the likelihood of confusion, each mark is to be considered as a whole."). Doing so, the Brinkerhoff Mark includes five words for a total of nine syllables ("Bar Hummingbird at The Brinkerhoff"), while the Club Mark has three ("Hummingbird"). The Court finds the mere overlap of the word "hummingbird" between the marks is insufficient to demonstrate any aural similarity between them that is likely to confuse consumers. Castle Pines "has not cornered the market on all potential uses of the [hummingbird] in commerce." *Kellogg Co. v. Toucan Golf, Inc.*, 337 F.3d 616, 626 (6th Cir. 2003) (where the defendant had not used any distinctive portion of Kellog's fanciful "Toucan Sam," its use of "Toucan" was not infringement).

Nor do the Brinkerhoff Mark and the Club Mark convey the same idea or stimulate the same mental reaction. *See Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65, 74 (10th Cir. 1958). The Brinkerhoff Mark clearly designates its relationship to bar and restaurant services, and specifically, the Brinkerhoff family of restaurants, whereas the Club Mark, on its face, suggests no particular service. And even if the Court accepts Castle Pines' argument that its mark has developed wide renown, the

evidence suggests that notoriety is foremost in relation to its golf course. (FOF at ¶¶13, 20.)

Turning to the Party Mark, while there is more visual similarity between it and the Brinkerhoff Mark, there is not enough similarity to risk consumer confusion. Both marks depict at least one hummingbird directly above script font, which in turn, is set above block lettering. But, as discussed above, the hummingbird depictions are dissimilar. And while the word "hummingbird" is a predominant element of each mark, the Brinkerhoff Mark as a whole simply is not "confusingly similar" to the Party Mark. *See Universal Money Centers, Inc.*, 22 F.3d at 1531. The Party Mark consists of three words and "hummingbird" is written in thick, bright-red lettering (with "THE" and "PARTY" in smaller, black lettering), while the Brinkerhoff Mark consists of five words written in thin, dark cursive and faint blue block lettering.

As with the Club Mark, the sounds and cadences of the Brinkerhoff Mark and the Party Mark are significantly different—"The Hummingbird Party" versus "Bar Hummingbird at the Brinkerhoff." And the meanings are dissimilar in that the Party Mark is not suggestive of restaurant or bar services. Consequently, on this record, the Court concludes Castle Pines has not shown the competing marks are confusingly similar.

    **b.   Intent**

"Proof that a defendant chose a mark with the intent of copying the plaintiff's mark may, standing alone, justify an inference of likelihood of confusion." *Sally*

13

*Beauty Co.*, 304 F.3d at 973 (10th Cir. 2002) (citing *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 941 (10th Cir.1983)). But "mere knowledge [of a similar mark] should not foreclose further inquiry." *GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir.), *cert. denied*, 498 U.S. 998 (1990). The appropriate focus is whether the junior user "had the intent to derive benefit from the reputation or goodwill of the [senior mark]." *Sally Beauty Co.*, 304 F.3d at 973 (cleaned up).

Castle Pines relies primarily on Mr. and Mrs. Brinkerhoff's associations (past and current) with the golf club and their residence on Hummingbird Drive in a Hummingbird Cottage as evidence of Brinkerhoff's intent to trade off the goodwill of the Club Mark. But this evidence does not end the inquiry. Brinkerhoff presented evidence that the Brinkerhoff family name has established its own goodwill in Colorado for excellence in the bar and restaurant industry such that it would not need to trade off the goodwill of others. (FOF at ¶¶1, 3-5.) To be sure, Brinkerhoff's use of the Brinkerhoff Mark demonstrates Brinkerhoff trading off no other goodwill than its own—it is building Bar Hummingbird at The Brinkerhoff directly adjacent to the new The Brinkerhoff restaurant where both establishments will share a parking lot with the existing La Loma restaurant, which is Brinkerhoff owned.

Castle Pines' evidence and argument regarding intent primarily focuses on what it surmises is Mr. Brinkerhoff's intent. But that singular focus ignores the role Mrs. Brinkerhoff played in developing the Brinkerhoff Mark. At the hearing, Mrs. Brinkerhoff credibly testified she developed the name of the forthcoming

14

establishment based on the spiritual significance of the hummingbird to her Mexican heritage and the Brinkerhoff's visit to Bar Hemmingway at the Ritz Paris on their honeymoon. (FOF at ¶¶11-12.) Based on her testimony, coupled with the unrefuted evidence of the goodwill the Brinkerhoff family name has established for itself in the bar and restaurant industry in Colorado, Castle Pines has failed to demonstrate Brinkerhoff developed its mark with the intent to trade off the goodwill of the Club Mark.

### c.     Other Factors

Considering the Court's above-findings regarding the lack of consumer confusion resulting from the marks and the lack of evidence to support the requisite intent, the other factors relevant to the likelihood of confusion need only minimal discussion.

First, it is undisputed there is no evidence of actual customer confusion. Second, the parties did not present evidence regarding the degree of care exercised by the relevant consumer—potential Bar Hummingbird customers. However, given the significant barriers to entry and the lack of marketing regarding Castle Pines' bar and restaurant services, even if the public uses a low degree of care in selecting a bar and dining establishment, it is unlikely they would associate Bar Hummingbird with Castle Pines' exclusive golf course, club, and other offerings. Likewise, to the extent any Castle Pines members or guests might also visit Bar Hummingbird, their knowledge of the Club's exclusivity suggests any confusion would be nil.

15

Third, at this stage of the proceedings, the evidence does not support finding the parties offer similar services. Castle Pines is an exclusive golf club, and based on its own evidence, is known primarily for offering a premier golf experience. (FOF at ¶13.) Although Castle Pines also provides bar and restaurant services, these are ancillary to its principal offering and are not open to the public. To be sure, when visiting the Castle Pines website, there is no information publicly available regarding its food and bar services. Relatedly, there is no overlap in marketing schemes used by Castle Pines and Brinkerhoff because neither markets their services. Castle Pines is an exclusive golf club whose membership is by invitation only, and Brinkerhoff does not advertise because it relies on the goodwill it has built over time. (FOF at ¶¶1, 3, 4, 13-14.)

On balance, these factors further support finding there is little likelihood of confusion between the Brinkerhoff Mark and the Club and Party Marks. Castle Pines has failed to meet its burden to show it is entitled to the extraordinary remedy of a preliminary injunction.

## 2.    The Remaining Preliminary Injunction Requirements

Castle Pines has not shown a likelihood of success on the merits of its claims for trademark infringement and unfair competition, and "there is, of course, no irreparable harm cognizable by law if there has been no infringement." *Predator Int'l, Inc. v. Gamo Outdoor USA, Inc.*, 669 F. Supp. 2d 1235, 1257 (D. Colo. 2009).

As for the balance of the equities, this factor compares the injury Castle Pines would suffer without a preliminary injunction versus the injury Brinkerhoff would suffer with one. *Haggard v. Spine*, No. 09-cv-00721-CMA-KMT, 2009 WL 1655030, at *15 (D. Colo. June 12, 2009). Because there is little likelihood of confusion, the harm Brinkerhoff would suffer if it was forced to cease using its mark and rebrand its entire concept outweighs any potential harm to Castle Pines. Finally, regarding the public interest, while the Court should "ensure that consumers will not be confused by the competing products," *Buca, Inc. v. Gambucci's, Inc.*, 18 F. Supp. 2d 1193, 1212 (D. Kan. 1998), the Court has already concluded there is little likelihood of confusion. Thus, the public would not be served by an injunction.

*   *   *

For the reasons shared above, Castle Pines Golf Club's Motion for Preliminary Injunction (Dkt. 23) on its trademark infringement and unfair competition claims is DENIED.

Dated: December 23, 2024

BY THE COURT:

S. Kato Crews
United States District Judge

17